JAMES L. ROBERTSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34709. Promulgated June 24, 1930.

*Watson Washburn, Esq.*, for the petitioner.
*C. H. Curl, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The respondent determined deficiencies in petitioner's individual income tax of $2,339.59 for 1923 and $5,243.67 for 1924, and the petitioner attacks this on several grounds. The evidence does not, in our opinion, sufficiently establish the facts to justify special findings and we discuss the evidence in the course of the opinion.

114

(1) The principal contention of the petitioner is that the partnership of which he was a member was composed not only of himself and one Veiller, but also of his two daughters, and that he was only required to include in his own income his share of such larger partnership, because the daughters' alleged shares went directly to them and were taxable to them. The respondent says that the daughters were not partners and that petitioner is taxable upon his one-half share of the partnership profits. Respondent admits that Veiller and Robertson constituted a partnership, but insists that it was comprised only of these two men and that the daughters were not partners.

A partnership, unlike a corporation, is not formed by a prescribed method. It may be recognized in a variety of conduct and circumstances, and the questions whether a partnership exists, and if so, the persons who compose it with consequent rights and liabilities, are difficult and may be differently decided by a turn of the evidence. They can not be decided solely with regard to the understanding of the alleged partners, their intention, their opinions or their conclusions, however admissible in evidence these may be. For despite their oral statements of their intention and understanding, the evidence of conduct and circumstances may indicate that in the eyes of the law no partnership exists.

In the present case, the existence of the alleged partnership comes into question long after the alleged event, collaterally, not to resolve disputes among the alleged partners *inter sese*, or with those who have dealt directly with the firm, but incidentally to determine the tax liability of one of its members. None of the firm's inherent rights or remedies is to be or can be affected by the decision. The Government, whose demand is being considered, has had no dealings with the business and imposes its tax only in the light of the circumstances in which the business has been conducted. When the taxpayer undertakes to avoid this tax, it is not too much to require his oral statement to be substantiated by evidence of facts and circumstances reasonably signifying that a partnership genuinely exists. This is especially true when the alleged partners are members of the same family and household. As in other cases where tax liability has been affected by close family relations, the statements, acts, and circumstances must all be considered and subjected to special scrutiny. *P. B. Foulke*, 2 B. T. A. 219.

The petitioner and Veiller had been associated for some time as real estate brokers, negotiating sales and promoting real estate projects in the vicinity of Grand Central Terminal, New York. For this they received commissions. Prior to 1921, it is not clear what the nature of this association was; but in that year they agreed

to be partners, each receiving one-half of the earnings. The petitioner testified that they agreed to share expenses; but from the accounts it appears that Veiller paid the rent, telephone and other small items of expense, while Robertson paid the salary of the bookkeeper and an occasional miscellaneous item. Subcommissions appear to have been sometimes paid directly out of specific commissions earned. No capital was required and none was contributed by either one.

Robertson had contracted a second marriage, which he regarded as unfortunate, and in 1922 he wanted to assure to his grown daughters an income. The relation between the daughters' income and the second marriage is not explained, but petitioner testified that this was the primary reason for the idea of making his daughters partners in the firm. From the standpoint of the business there was no need for their admission into the firm, for they had no business to bring and no service to perform. We can give scant weight to petitioner's statement that by reason of their " contacts " they were " able to tell us of the possibilities " of business. In 1922 he suggested to Veiller that his daughters be taken into the firm and receive, with himself, one-sixth each of the earnings, Veiller to retain his one-half share unaffected. The bookkeeper was then instructed to account for the earnings by allocating one-half to Veiller and one-sixth to Robertson and each of the two daughters. The older daughter was then and has since been a " newspaper woman " and the younger daughter remained at home. Aside from the older daughter's coming into the office once or twice a week, neither took an active part in the business and neither brought in any earnings or was responsible for any commissions. The older daughter was in Europe for three months in the winter of 1923 and 1924. The younger daughter was apparently responsible for the household.

The partnership of Veiller & Robertson made no contracts, incurred no liabilities, and had no bank account. The rent and telephone were assumed by Veiller alone. When commissions were earned they were received by either Veiller or Robertson. Veiller took them in about 70 per cent of the time. He then gave his check for one-half to Robertson and Robertson in turn gave his check for one-third to each daughter or deposited such a check to her personal account in the local bank in Bronxville. The daughters used the money to build their residence.

The only accounting entries as to the daughters was a record of one-sixth of each commission received. There was no double entry system, no profit and loss statement, no balance sheet and no ruling or closing of the accounts. No part of the expenses was charged to or paid by the daughters.

Robertson introduced his daughters to several people as members of his firm. Neither of the daughters was a licensed real estate broker, but Veiller and Robertson and the firm were licensed.

This in our opinion was nothing more than a method by Robertson of distributing his partnership income among his daughters and himself. The relation between the daughters and the business was without substance and was not founded upon any reason or conduct which would justify a belief that the daughters were partners. The petitioner relies upon the testimony that he told several people that his daughters were members of the firm, and his counsel urges that this has the force of an admission, because thus the daughters' interest in their house became subject to attachment for partnership liability. As to the Government in this proceeding such statements have not the force of admissions but are self-serving. The statements appear to have been casually made without the force of affecting legal relations with the persons to whom they were made. To such persons the statements made no difference. Since, for example, the partnership had no bank account, the petitioner's statement to the vice president of his personal bank that his daughter was his partner had no legal significance. He was not authorizing her to sign either his or the firm's name. Had he done so, and had the daughter attempted to bind the firm, and had he or the firm repudiated her act or statement after the bank had acted upon it, the question might arise as to his estoppel to deny the partnership relation and his liability or her estoppel to hold the house clear. But such an issue is not here, and the proposition asserted merely begs the question. Since, in our opinion upon the evidence before us, the daughters were not partners, we can not assume an hypothesis making their property liable for partnership debts.

The other statements or introductions which were made were, so far as the record shows, not made under circumstances which give them serious significance as a holding out of the daughters as partners for business purposes. They were not made as an incident to any business transaction, present or prospective. No credit was encouraged and no right or dealing was affected or promoted. In short, the statements had no juristic significance or consequence, and we can not recognize them as establishing a partnership or as sufficient, in a proper case, to estop a denial of its existence.

The respondent correctly computed the petitioner's share of partnership income.

(2) The respondent increased petitioner's net income for 1924 by disallowing a deduction of $2,400 taken as debts ascertained to be worthless and charged off in the taxable year. The disallowance was said by respondent in his notice to be because no explanation

of the deduction had been given by the taxpayer. The petitioner testified that the alleged debts were due from two persons, Kenneth W. Fertig and James E. Ingram, Jr.

(a) The statement as to the Fertig account is that Fertig had become involved in some sort of difficulty which threatened his imprisonment. Petitioner was a family friend. On June 18, 1924, he gave Fertig two checks payable to Fertig, one for $50 and one for $250. These checks appear to have been paid on June 19 and June 20. Fertig under date of June 26 gave petitioner his demand note for $300, payable at the Gramatan National Bank, Bronxville. The note, torn in pieces, is in evidence and contains no indication of presentation at the bank. There are also in evidence five canceled checks drawn by petitioner to one Arnold, dated in July, August, September, October, and November, 1924, for $101.85, $102.25, $102.85, $103.35, and $103.85, respectively. These were said by petitioner to be payments made by him to the attorney for the person who had the undescribed claim against Fertig and to represent the face amount plus protest fees of notes of Fertig which petitioner had endorsed. The notes are not in evidence, but were said by petitioner to have been " made in such a way that [Arnold] collected the amount of each one that went to protest in order to have some claim on Fertig in the future." We can not understand why or how Arnold should have a future claim on Fertig if the notes were paid by petitioner. Fertig went to Atlanta before the end of 1924 to engage in the Florida real estate business. Petitioner wrote him a letter in October, 1924, and received no reply. Petitioner then heard that Fertig was later in Long Island having a hard time.

We think this is not sufficient to prove that the alleged debt was ascertained to be worthless in 1924. If there was a serious debt in 1924, as petitioner contends, it was not demonstrated to be worthless by a showing that within a few months after the loan petitioner " wrote him," and, receiving no answer, let it drop. *Skinner* v. *Eaton*, 34 Fed. (2d) 576.

(b) The Ingram alleged debts were said to arise out of two loans made by petitioner in August, 1923. Two checks drawn by petitioner to the order of Ingram are in evidence, one for $1,250 dated August 6, and one for $900 dated August 23. Both were said to represent loans, the latter being through an exchange of checks with Ingram. Ingram's check came back for lack of funds. Later, Ingram paid petitioner $150 and said he intended to sell his automobile. He then moved to Darien, Conn. Petitioner in 1924 put a claim against Ingram in the hands of attorneys and was advised by them that they were unable to collect. There is no evidence

of the nature or extent of their efforts to collect or of Ingram's financial condition in 1924 which would justify petitioner in charging off this substantial amount in little more than a year after the debt was incurred. The Supreme Court's statement as to incorrigible optimism, in *White* v. *United States*, 274 U. S. 398, can not be treated as justifying less than reasonable patience and persistence or as recognizing evidence which does not disclose that reasonable efforts to collect were futile. See *Alemite Die Casting Mfg. Co.*, 1 B. T. A. 548.

The respondent's disallowance of the bad debt deductions is sustained.

(3) The Commissioner has allowed no deduction for luxury taxes, auto license tax, or rental for safe-deposit box, " as no evidence has been submitted to substantiate these expenses." The only evidence before us is petitioner's oral statement. To support a deduction for luxury taxes, he testifies that he estimates an expenditure of at least $200 a year for theatre tickets. Accepting this statement as fact, however, we can not infer the amount of tax which was paid. Since the Commissioner has disallowed the amount for want of substantiating evidence, we can not accept petitioner's bare estimate of the amount spent for theatre tickets as proof of the amount paid as luxury taxes. This is especially true since the partnership income was apparently reduced by $25 a week drawn each by Veiller and Robertson as business expenses of entertainment. This blanket amount must be deemed to include the luxury taxes incident to the entertainment.

The automobile taxes claimed were also orally estimated by petitioner to be about $18 a year, and we do not regard this as sufficient proof to overcome the Commissioner's disallowance.

The safe-deposit box was used for jewelry, automobile insurance papers and various papers, some of which were said to " relate to business." This rent of $10 is not deductible because it is in part at least a personal expense.

(4) The Commissioner added to petitioner's income $260 for 1923 and $1,800.52 for 1924 representing bank deposits which are unexplained. The evidence shows that petitioner's only source of income was his share of partnership earnings and that his bank account included loans and repayments of loans. He was able to identify almost all of such items. In our opinion the evidence is sufficient to prove that these amounts were not income of petitioner and they should be excluded in a recomputation.

*Judgment will be entered under Rule 50.*